Good morning. May it please the Court. My name is Eitan Kasteljanich. I'm representing Geneva Crose in this appeal. Crose has been unable to perform any type of full-time work since September 2006. This case went through federal district court twice, so this has been going on for a long time. She's been diagnosed with a number of different physical and mental impairments, but the biggest issue here appears to be a combination of PTSD, depression, and somatoform disorder. In this case, there were many different medical opinions that supported her disability claim, and the list I won't repeat it for you here, but it's about ten doctors, and the ALJ rejected all of those opinions. There was also a medical expert who testified at her second hearing, and he testified that she met a listing, at least since I believe 2009, and the ALJ rejected his opinion as well. So basically, we've got every supportive opinion gets rejected, and all we've got left, well, there were three non-examining physicians. ALJ rejected one of those. That leaves two of those, and the ALJ, I think, gave significant weight to those ALJ should have given controlling weight, or at least proper deference, to Dr. Wilk's opinion. Dr. Wilk was Ms. Croce's treating physician for about three years, treated her a number of times, was familiar with her physical problems and her mental problems, and concluded that she had difficulties that would prevent her from working. And the ALJ fully rejected her opinion. Well, could you please elaborate a little bit more on why Dr. Wilk's conclusions were well supported by clinical and laboratory diagnostic techniques? Well, the main thing is that one of the things she had done while treating Croce, there were three epidural steroid injections in her lumbar spine. And I can't recall now if she's the one who did that or if these were just in her records. So she was familiar with the back pain and the ways that that was being treated. But mostly it was, well, things like, for example, in August 2013, she was treating her for dysphoric mood and somatic symptoms. So it was, every time she would see her, she would note her observations of how, you know, the problems that her patient was having. And so she's the only person in this file that actually saw and treated Croce over an extended period of time. And so was familiar with the progression of her various impairments. And, you know, one of the things, too, one of the things she discussed, which is I think one of the main things that supports the physical limitations, and this is not just from Dr. Wilke's opinion, but it's also her notes, but it's also from the others who examined Croce, she noted that she had reduced range of motion in her spine and an abnormal gait, muscle spasm, muscle weakness on dorsiflexion of the right foot. So she recorded all of these findings, which then ultimately when she was asked, well, what's your opinion about her functional limitations, she gave her opinion, and her opinion was she couldn't, basically couldn't work. Now, those were the physical limitations. What about the mental status examinations, which had a wide range of scores? You know, with Dr. Wilke, it's, for example, I guess as far back as September 2011, she noted that she was taking prososin for nightmares, but was still waking up from the nightmares. She reported that she was having anxiety attacks and flashbacks three times a week. Now, that's sort of a mix between subjective, objective, because it's partially the patient reporting it, but it's also her treating physician hearing the reports and prescribing medication, which she takes, and then hearing how is that medication working for you, is it working. And in September 2011, she was still waking from her nightmares, and then Dr. Wilke adjusted her medication. So Dr. Wilke was actually prescribing psychotropic medications to her. And so it's, you know, it's, there's more to a mental, a person's mental status than what you just report, you know, record in a mental status examination, because you can look at them, you can see whether or not they're acting afraid, whether they're acting depressed, whether they're crying at your appointment. And so it was really the combination of all of her knowledge as a treating physician. And the other thing that's important here is that, and this isn't, once again, just from Dr. Wilke, but it's from Dr. Nimes as well, the somatoform disorder diagnosis, which is sort of a combination of the feedback between how her mental problems were affecting her and how she had psychological factors affecting her physical condition, and it was exacerbating her, so it was going, it was running both ways. And others as well noted that same thing. So it gets complicated when you've got, I mean, she had a very unfortunate experience as a young child, and that, in her case, has stayed with her in a very bad way. Thank you. So based on all of the medical evidence here that supports, all of the examiners all agree that Crose has these limitations, has these problems, well, then Crose testified about her limitations at her hearings, and yet the ALJ fully rejected everything she had to say. And it's interesting, when you're looking at a case that's been going on for nine years, you can, you know, at that time it was, I think at the time of the ALJ's decision, maybe it was only seven or six years, but still, it's a long period of time where if you look through the record, you're going to find evidence where she's having a good day, or she's went off and did something, but the overall picture was consistent with her complaints about basically very seldom leaving the house, because she's afraid. That's sort of what the mental limitations sort of boil down to here, that she can't handle, she's very stress-averse, and very averse to just being out in public, and living a very sheltered life. How long, the medical records were 2,000 pages? Well, yes. I look at the overall file, but yes, the medical was over 2,000 pages. And it's not, you know, I don't usually stand up here and talk about the, there's ten doctors and they all said she had problems, that if you looked at, if you accepted those problems, that would support her testimony, and it would support that she can't work, but that's all I've got here, is everyone who's seen her. And one example, there's Dr. Almaraz, who was a neurologist, that she saw sort of the ALJ sent her out to see Dr. Almaraz at sort of, I think it may have even been after the hearing, or right before the hearing. And even Dr. Almaraz, he didn't find radiculopathy, but he noted a lot of clinical observations and findings that supported the complaints of pain. So although his diagnosis, I think his diagnoses, his conclusions are, they do contradict the other evidence in the file, his findings don't. His findings are actually consistent, for example, with Dr. Wilkie's, that he had, that she has a lot of physical findings that could support her complaints. And he also identified the connection between the psychological problems and the physical problems and how they feed back here. Let me just give you my take on the case and tell me if you think I'm, you know, I'm missing something. Because I guess it seems very complicated when you have this many medical professionals weighing in, and there are, this is one of the larger records I've seen in the social security case so far. But at the end of the day, it seems to me, the doctors on the whole are consistent in saying, we really can't find anything physically wrong with you that would cause you the degree of pain and discomfort and the like that you're suffering. But they all seem unanimous in saying that there are whatever, there are psychological issues that you are having that somehow are affecting, I guess, you know, what you're feeling, right? And in light of that, they say she can't work. And that all seems reasonable if we're able to accredit those opinions. But I guess I assume that it came down to whether the ALJ was justified in not believing your client. Because a lot of the psychological issues that the doctors are then weighing in on, they obviously have a self-reporting component. And if the ALJ was justified in saying, I just don't find Ms. Crowe's credible, then it seems to me he or she, I can't remember, could then say, I just can't give much weight to these physicians. So that's kind of how I see it in a simplified form. Is it more, there are more complications than that? Well, there's some truth to that. I think that if you took away, if you could take away the mental problems, the physical problems wouldn't be as overwhelming as they are. But I think even if you just look at the physical problems alone, what you really have to look at is, is there medical evidence, objective medical evidence showing that she has a condition that can cause some pain? There is. And because of that, you then have to look, well, what's her description of the pain? Is it consistent with the overall evidence? So you can't, you alone, actually, because she meets that first step of showing that she's got objective evidence, you can't then say, well, she's complaining, we don't believe her because she's complaining about excess pain, pain that's bigger than you'd really expect. But there's an explanation here for why she's complaining about pain that's more than you might have expected. And that is the trauma that she experienced has caused what's been called mental disorder, which, once again, it's that cycle feeding between the physical and the mental that exacerbates her perception of pain. Her pain is, it's there. Take away the mental, it's still there. But with the mental, it's way worse than you would have expected. And the other thing I think I would encourage you to look at is the, this Court's recent decision in Buck, which addressed that you can't really look at mental, all these mental evaluations. The numerous psychologists and psychiatrists who examined her weren't just reporting what she was telling them. They were looking at her and watching her and looking at her facial expressions, seeing her crying in her office. They could, so they were, it's always going to be a little bit of a combination of subjective and objective, but it's primarily objective, because the psychologists know that's what they're expected to report. Isn't it to her credit that she sought so much medical attention? I mean, she, you know, she saw all these doctors over a long period of time. She's obese, which in my experience tends to exacerbate physical symptoms. She had two suicide attempts. She had right shoulder arthroscopy. She had irritable bowel syndrome. She had a sort of constellation of general generalized conditions throughout her body which were treated. When she could afford to seek medical attention or when she had insurance, she seems to have done that for both mental and physical complaints. And I guess my sort of big picture concern was if you take 2,000 pages of medical records, I could probably go through with a highlighter and come up with portions that would prove or disprove anything. And my concern is a little bit about just the methodology. How do we even absorb this much material and come up with a way to answer the difficult question in this case? It's interesting. Lately it sometimes seems that ALJs, some ALJs view their role as coming up with reasons and excuses to reject medical evidence, not methodology to weigh evidence. The focus is, well, certainly in this case, that's all we see. Do you think there's a disemphasis on the mental component where folks are, it's too easy to discount that or not maybe appreciate that mental illness can create pain, can do all sorts of things. People commit suicide. They suffer physical pain as a result. Is that... I wish... ...appreciated? I wish I didn't have to say this, but it's a widespread perception among attorneys who practice this area of law where we have actually done statistical analyses looking at various ALJs who turn down every single disability claimant who is indigent. They just don't ever approve an indigent, mentally ill disability claimant. And I hate to say this, but our streets reflect that. The homelessness reflects that. This is not such a judge. I think he messed this one up. He's someone who would not ordinarily dismiss people just because of that. But I think that systemically it's a concern because it is hard. It's hard to understand what other people can be feeling and that's in their head and how that can affect someone. To go through the trauma this woman did and then to question it down the road, how she's affected by it, is very sad. And that's... I don't really have more to say on that. Okay. We'll give you a little bit of time for rebuttal. Let's hear from the Commissioner. Good morning, Your Honors. May it please the Court. Sarah Martin on behalf of the Acting Commissioner of Social Security. I would agree this case is complicated medically and to answer Your Honor's concern, the person who was in the best position to evaluate the overall record, the very lengthy record in this case, was the ALJ. That's the ALJ's function. And unlike some of these doctors, the ALJ had access to all of the medical records. And in a 47-page, somewhat unprecedented 47-page decision, the ALJ very carefully went through the record and appreciated... How do you know that? I mean, you don't know. You don't know what the methodology was. I'm not criticizing the ALJ at all, but a lot of lawyers and judges look for efficiency. They go through with a highlighter. They get an assistant to prepare things. And I guess my point is that it's an almost impossible task to ask an ALJ to go through a record and balance everything and holistically look at everything and reach a decision in a case like this. It's just a very, very difficult job. It is a difficult job, Your Honor, but it is the ALJ's job. It's the agency's job to weigh all of that evidence, and the ALJ did do it carefully. I can't speak, of course, personally to the ALJ's methodology, but what we have is the ALJ's reasoning. It is a very difficult job to weigh all of the issues and weight every piece of evidence. There's no accusation that he failed to weigh something. In any case, I would just... I guess my problem, though, is that he's basically rejected the consensus. It's an almost unanimous consensus among a large number of medical professionals, right? No, I would absolutely disagree with that. Not all of the people who examined her thought that she was unable to work from either a mental or physical perspective. On the physical side, for example, much has been made, of course, of Dr. Wilkie's treating source opinion. Dr. Yerim was also her treating doctor and completed a similar opinion form, finding that she could do medium work based on her impairments. Now, the ALJ thought she was more limited than that, but that also does support her ability to work from a physical perspective. On the mental side, several of the examining doctors thought she could work from a mental... I think the way you've just approached this is the problem, that you can't separate the two, right? And that's what I'm saying. The consensus, it seems to me, that emerges from... All 2,000 pages. But the consensus that emerges is that she has some psychological conditions that are affecting the amount of pain and whatnot that she's experiencing on the physical side, right? And even the independent medical person who was called to testify says, basically, yeah, I come out the same way and she meets... I've never seen one where they... I guess we don't see them when they say that, yeah, she actually meets a listing. We always see them when... Yeah, they do say that a lot and we don't see those cases, of course, on appeal. They do find people disabled a lot. But I would... Yes, I want to talk about the medical expert, but I just wanted to say that some of the psychological examiners who found she could work from a psychological perspective were saying that regardless of what psychological symptoms she's having, they still thought she could work full-time like Dr. Niemes and Dr. Esparza, for example. Also, there was... Much was made here about Dr. Wilkie seeing her over time and noting her mental status, but the person who treated her for her mental impairments was a therapist, Ms. Rollman, who also thought she could work. And part of the problem, and again, to Your Honor's earlier point, she sought a lot of treatment, that's true, but she didn't seek a lot of treatment, too. She sought a lot of treatment for different impairments over time, some of which were found to be by those doctors suspect and unfounded, like her tremors and some of the providers suspected that her complaints were not genuine. But the... I just, I mean, I don't know, you kind of throw that out casually. I don't know that that's supported, actually. You're talking about the secondary gain concerns? Yes, Your Honor. More than one provider noticed that concern, and in one case, the doctor who found completely normal objective testing on all MRIs and all the other testing suspected that. And a different provider noted that she only had tremors when she was talking about them. So I think those taken together call into question those symptoms. Well, okay. But I guess I would put a lot more stock maybe in Dr. Wilke's opinion, given that she has the broader perspective. And what you're saying, I think, is that she's just making this up, and that she really is not experiencing the kind of suffering that she claims to be. And Dr. Wilke says she absolutely is not malingering. And I'm sorry, Your Honor, no, I'm not saying she's making it up. I agree with Your Honor's earlier assessment of the case, which is that essentially her complaints are out of proportion to the objective findings, both on the physical and the mental side, because she did perform pretty well on mental status examinations all throughout the record. And Dr. Toews, who testified, he summarized all that, and he said that. He said that quite clearly. He said that she performed pretty well on mental status exams throughout the record, as far as doing simple work and not having social limitations that were disabling. And he did say, before he went on to say that she met a listing sort of in a confusing fashion, he did specifically say that she was not disabled from her psychological factors alone, from a psychological perspective. But then, as Your Honor pointed out, he then essentially seemed to credit her subjective complaints of pain. And it's not just pain, though. It's also her inability to deal with stress and be around other people in a, you know what I'm saying? I mean, that's, it's not just, you can't isolate it into, there's this, and then there's that. It's a combination of things, and that's what Dr. Toews, is that his name? Yes, but first he said from a psychological perspective, which would incorporate that stress and those other things that Your Honor's talking about. He did say that she could work from a psychological perspective. And then he went on to talk about the pain, and he seemed to essentially credit her subjective reports of pain. But at the same time, he said a lot of things that would doubt those, the legitimacy of those pain complaints as well. Well, he spoke about her daily activities, cooking, taking care of children. But we have not inserted a case, verdicant, the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking, does not in any way detract from the credibility as to her overall disability. And I think that case is talking about when a person carries on certain minimal daily activities, like just the minimal to get by. But there are lots of other cases, Rollins and many, many other cases, that if the daily activities do contradict their testimony about their abilities, that's still a legitimate thing. The ALJ is still required by regulation to look at those activities as one of many factors. And here, for example, she complained about being too anxious to leave the house, and yet the activities show that she was going out a lot, doing social things, taking her children out, going out and attending functions and parties and things. But that's just, I mean, that's just not an accurate universe of this lady's life. We don't know what she did every day. We don't know whether she went through a period of remission with some of these conditions where she was able to do those things, and other days where she stayed at home in a dark room. So isn't that unfair? Just to say she could do certain things at certain times, therefore, during this eight-year period, she was never disabled? So the ALJ is required to look at her allegations, again, as we've been talking about. Dr. Toh seemed to credit those. And the ALJ, instead, what Your position at no point was she disabled during this period? Totally disabled, that's correct. That's the Commissioner's position. But the ALJ, so unlike Dr. Toh's, the ALJ was required to then look at those subjective complaints and carefully weigh those, the so-called credibility analysis. And the activities are just one of many factors the ALJ is required to look at, and by regulation is required to. And he looked at all of those factors, not just, he didn't just pick one daily activity that she did. He went through the whole record and looked at all the factors, and gave many, many reasons why her, you know, somatoform disorder essentially confirms that her pain complaints are out of proportion to what's going on objectively. And so then he went to look at those allegations of her subjective symptoms and weighed them against all of the evidence in the record to see whether those were reliable or not. And, you know, as I mentioned, there were several providers who So, do you think the state of medical science is such that we have the ability to always trace pain to some diagnostable, diagnostical, diagnostable neurological condition? Do you think that every time someone experiences pain that, that they're, that it's not real because there isn't an objective way to test that pain? I am not a medical expert. I know pain is complicated and it can have many, many factors, but this is what the law requires the ALJ to do, to weigh the evidence and find whether there's support. She, if she's feeling Can I just ask a question? Yes. How do you reconcile the fact that the ALJ found she had somatoform disorder with the fact that the ALJ discounted the opinions of some doctors because they did not base her pain symptoms on an underlying neurologic condition? Isn't this the definition of a somatoform disorder? I think so. I think somatoform disorder, which the ALJ found she had, just confirms, like I was saying, that her complaints are out of proportion to what's going on objectively. But the ALJ then has to So what does that mean? It means, no, no, no, it's not about intentionally lying. It's about whether her, she's saying she's disabled because she feels these are her limitations. But the fact that she thinks she has, basically the evidence shows she's more capable than she believes she is. And that's essentially what a credibility finding is, is the ALJ, in every case, the ALJ looking at the objective, all of the evidence, excuse me, all of the evidence, and determining what can she still do despite her limitations, even though she may think that she's more limited than that. More capable than she feels she is, and that's not part of the mental health component? I think it's all, it's all part of the same, both physical, from all perspectives, mental, physical, and everything. I mean, I guess I've just, I would differ with you a little bit about what you just said, because I think in order for the Commissioner to prevail here, we do have to be convinced that she's exaggerating all of this, and that none of, at least up to a large extent, what she's complaining about is not real, and that she knows that, and that she's doing it for some purpose of secondary gain, and I just don't, this is not, I mean, we get these cases all the time, where ALJs make adverse credibility determinations, and this just, I don't know, this seems like I don't have any doubt, really, that, in fact, she's not making this up. It seems too confirmed by too many different medical sources to just dismiss it as, no, you really are able to go out and work a full-time job, but you just don't want to. I just don't see that here. Yeah, and again, I respectfully disagree, Your Honor. It's not about intention, and there is an adverse credibility finding in every denial of disability benefits, because every claimant thinks they're unable to work and alleges that, so the ALJ has to weigh that in every case. It's not about intention, it's about him weighing those allegations and seeing if they're consistent with the rest of the record, and that's in the regulations that the ALJ is required to do that, and so, again, it doesn't, it's not about whether she's intentionally exaggerating or lying. It's about whether her statements about her abilities are reliable and whether they're consistent with the rest of the evidence in the record, and while... But that's what I'm saying. Doctors are saying, no. Some of them. Yeah, but her treating physician and this independent medical person who comes in to review everything and says, yeah, you know what? It's all legit. This is not just made up, and I guess the ALJ is not a doctor, so how... Well, other doctors are saying the opposite, and the ALJ had to weigh these conflicting opinions, and that is the ALJ's job, is to weigh those and to determine which ones are more reliable based on the whole record. Do we have a doctor who actually says... Again, not trying to segregate it psychological, physical. Someone who puts it together and says, no, in fact, she's not suffering from whatever this thing is called, psychological factors affecting physical condition. Do we have a doctor who just says flat out, no, that's not what she's suffering from? No, but it's not about the disorder she does or doesn't have. It's about what her abilities are, given her symptoms and objective findings. And so, for example, Dr. Esparza examined her, and Dr. Niemes, who examined her, said that from taking into account all her psychological symptoms, because I think we're talking about pain being essentially a psychological symptom at this point, and those doctors thought that she could work, even given all of that. But they were not treating physicians, correct? That's correct, Your Honor. They did not observe her in a person-to-person situation, as did her treating doctor. That's true, Your Honor, except for that her mental health counselor did observe her over time, and did also think that she could work in a low-stress job. And as to the point earlier about treatment, treatment inconsistencies is actually one of the reasons that LJ relied on in finding her claims not reliable. Although she sought medical treatment for different conditions, she did not go back to mental health counseling. Right, because she didn't have insurance and didn't have any money. Well, she was able to access health care. Sometimes. Right, and when she did... Not all the time. Right, but she... Sorry. Go ahead. Well, but after 2009, she did have the ability to seek treatment at different points throughout the record, but she did not seek mental health counseling. She also didn't seek physical therapy for several of her physical conditions, and she sometimes stopped taking her medications. There's one point in the record where she said she stopped taking... are rigorous in terms of their ability to follow up with medical, with mental health care. I can't speak to all people and what they can do. All I know is that... Isn't that sort of circular logic? It is a factor that the ALJ can consider in the case law and in the regulations and in agency policy. She sought mental health counseling over some period of time, and it was working. Ms. Rollman said that her symptoms were manageable at the end of that period, but she stopped going, and Ms. Rollman said she could come back, and she didn't do that. I don't have any information that's not in the record about why that might be. Can I ask you just maybe one question, because your time is running out? If we were not to go with you on the arguments you've made quite capably this morning, would you agree that if we're going to reverse, we just need to remand for an award of benefits, right? Because there's no... There cannot possibly be any more proceedings that would be necessary to resolve this, would there? Well, I would not agree with that. There are... At the very least, there's an issue of drug addiction in the record that hasn't been developed. That was all throughout the record, not just a little mention of it here and there. Dr. Toews, the testifying medical expert, talked about her addiction to narcotics as well as benzodiazepines, and to the extent that might be contributing to her disability, that it would need to be addressed on remand. Okay. All right. Thank you very much. I think your opponent has a little bit of time left for rebuttal, and we'll be happy to hear from you. Oh, no. Actually, you didn't. We'll give you a minute. Thank you. And I don't have a lot to say. I just wanted to point out that Ms. Rollman, who was her counselor, actually said that it would be a good idea for her to try to do part-time or volunteer work. She didn't actually say that she thought she could do actual work. Dr. Esparza's opinion was rejected because he basically said that she doesn't have anything – he said there was something psychiatrically wrong with her. This was early on in this whole process. But physically, and the way she was crying at his evaluation, he thought that she couldn't handle work, but she thought it was because of the pain she was experiencing. And she was having a lot of pain problems at that time. So that's back to the combination of physical and mental. Dr. Nimes actually also said the limitations he came up with would prevent her from working. So his opinion supported her. So I don't know why the government's arguing that it didn't. So I would ask that this has gone on long enough. Thank you. Thank you. The case just argued will be submitted.
judges: D.W. Nelson, Watford, Pregerson